STATE OF NORTH CAROLINA

BRUNSWICK COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
21 CVS ___728___

2021 APR 16 P 3: 33

RICHARD and DOLORES BRACKIN;

         Plaintiffs,

v.

WAUPACA ELEVATOR COMPANY,
INC.;

         Defendant.

**COMPLAINT**

*Jury Trial Demanded*

By and through undersigned counsel, Plaintiffs Richard and Dolores Brackin hereby allege and state as follows upon information and belief, the investigation of their counsel and/or publicly available information:

## PARTIES

1.     This action arises out of the free fall and crash of an elevator at the Plaintiffs' home in Brunswick County, North Carolina on December 2, 2020, seriously and permanently injuring both Plaintiffs.

2.     This case marks the second instance of an elevator free falling and crashing to the ground in Brunswick county within the last six months and at least the fourth instance here in the Cape Fear region of North Carolina within the last three years. The common denominator: the elevators were manufactured and produced by the same company – Defendant Waupaca Elevator Company, Inc. ("Waupaca").

3.     At all times relevant hereto, Plaintiffs Richard and Dolores Brackin, both in their 70s, have been and remain lawfully married as husband and wife. Both are citizens and residents of Brunswick County, North Carolina.

4.     Defendant Waupaca Elevator Company, Inc. ("Waupaca) is a Wisconsin corporation with its principal office being 1726 N. Ballard Road, Suite 1, Appleton, Wisconsin. Founded in 1957, the company produces residential elevators and dumbwaiters for distribution and sale throughout the United States, including North Carolina. Waupaca is the manufacturer of the elevator that was installed and crashed with Plaintiffs on board.

5.     Waupaca distributes its elevators through a network of authorized dealers and service companies for sales and installation throughout the United States, including in Brunswick County, North Carolina. Through its authorized dealers and service companies, Waupaca directs the sales and service of its elevators within Southeastern North Carolina through companies such as Hodges Electric in Wilmington; 101 Mobility LLC, also in Wilmington; Port City Elevator, Inc. in Castle Hayne; and Home Elevators & Lift Products in Sunset Beach.

## JURISDICTION, VENUE AND SATISFACTION
## OF ALL CONDITIONS PRECEDENT

6.     Jurisdiction over the parties and the subject matter of this action and venue may be properly exercised by this Court pursuant to N.C. Gen. Stat. §§ 1-75.4, 1-80 and 1-82.

7.     At the time of filing, Plaintiffs have satisfied, met, or performed all conditions precedent and have filed this action within the time frame allowed by any applicable limitations period.

## FACTUAL BACKGROUND

8.     On December 2, 2020, Plaintiffs Richard and Dolores Brackin entered their Waupaca residential elevator – the same way that they have done for nearly 20 years previously without incident.

9.     While the elevator was in motion, it suddenly fell, crashing to the ground floor, three stories below, severely injuring both Plaintiffs.

2

10. Due to the elevator's crash, both Plaintiffs:

   a. Sustained permanent, serious and painful injuries to their persons, including, but not limited to, broken legs;

   b. Experienced, and will continue to experience in the future, great pain and suffering;

   c. Incurred, and continues to incur, medical and other expenses for necessary medical treatment, including ongoing orthopedic treatment and physical therapy;

   d. Experienced, and continues to experience, great discomfort and distress in performing their daily activities and providing care and comfort to one another; and

   e. Suffered, and will continue to suffer, other injuries to be discovered and proven at trial.

### The Waupaca Elevator Recall

11. At the time of the crash, the elevator was under a recall by its manufacturer. That recall was initiated by Defendant Waupaca in October of 2018 after the company learned of other crashes involving similar Waupaca elevators.

12. The elevator that fell with the Plaintiffs inside it is among those recalled.

13. The elevator is a winding drum elevator – one where the cables that support, lift and lower the elevator cab are attached to a drum, similar to the one depicted here. The drum is turned (causing the elevator cab to raise or lower) when a motor moves a



Figure 1: Winding drum and gearbox from a recalled Waupaca elevator

3

worm gear, which in turn moves a larger ring gear. These gears are contained in a gearbox.

14. The teeth of the ring gear used in these particular elevators, according to Waupaca, and as has occurred on numerous occasions, becomes shorn prematurely. When this happens, the ring gear loses its connection to the worm gear and motor, providing no resistance to the drum and cables. The result is an elevator cab that falls to the bottom of the elevator shaft and crashes.

15. Waupaca has known of this condition since at least January 2018. Waupaca has received numerous reports of failures and injuries caused by falls and crashes similar to the one here and has been sued as a defendant in multiple state court actions, some here in Southeastern North Carolina.

16. On October 25, 2018, as a result of Waupaca's knowledge from those accounts and perhaps from other information available to it, Waupaca announced a recall of approximately 8,000 Custom Lift 450 and Custom Lift 500 elevators manufactured between 1976 and 2008 through the U.S. Consumer Product Safety Commission's ("CPSC"). The recall effort was initiated under the CPSC's Fast Track program, a program offered by the CPSC to manufacturers of products to encourage them to come forward, of their own volition, to recall dangerous products more quickly.

17. According to the CPSC's website,[1] the program offered Waupaca several benefits:

> Businesses that successfully complete the Fast-Track program benefit in the following ways:
>
> - *CPSC staff will not make a preliminary determination (PD) that the product contains a defect that creates a substantial product hazard. (Some businesses are concerned about the effect of a*

---

[1] United States Consumer Product Safety Commission, *Learn About the Fast Track Program*, https://www.cpsc.gov/Business--Manufacturing/Recall-Guidance/CPSC-Fast-Track-Recall-Program (last visited March 4, 2021).

*CPSC staff PD on their firm due to concerns about product liability and other private lawsuits.*)

- By removing the product from commerce quickly, the potential for incidents and injuries to consumers.

  customers from potentially harmful products may be reduced, and *may therefore reduce the occurrence of product liability claims or other lawsuits.*

- Voluntary corrective action by the recalling business is completed much faster.

- Businesses are assigned a point of contact at CPSC who will guide them through the recall process. Office of Compliance staff will provide a significant amount of assistance to first-time participants in the Fast-Track program as they go through the recall process.

18.     To remedy the problem, Waupaca recommends a replacement of the entire gearbox. *Id.* However, at the time of initiating the recall and continuing through the present, Waupaca has failed to make available a sufficient number of replacement gearboxes to owners of its recalled elevators.

19.     As an alternative to replacing gearboxes on all of the recalled elevators, Waupaca first recommended that owners have their current gearboxes inspected by one of the company's authorized dealers and service companies.

20.     However, the gearbox is a sealed system. It simply is not possible to inspect the teeth of the gears and other components without opening the gearbox. Thus, when an owner contacts Waupaca or contacts a service company, as instructed by Waupaca, a Waupaca-approved dealer and service technician goes to the owner's house to check the oil for the presence of metal shavings. The presence of metal shavings in the oil indicates that the teeth of the gears has begun to shear. Waupaca maintains and represents to owners and its network of dealers and service

5

companies that the recalled elevators can still be used so long as there is no evidence of metal shavings found in the oil located inside the gearbox. That is not true.

21.     Regardless of whether the shavings are found in the oil, the gearboxes are dangerous and subject to imminent failure. Elevators with deteriorated and dangerous gears have fallen even though their gearboxes had oil removed and tested by either Waupaca or a Waupaca-selected lab.

22.     Waupaca is well aware of the stresses placed upon the gears in its elevators. Waupaca knows that the elevators can fail during regular and normal use even if the elevators are properly installed and the owner and technicians follow Waupaca's instructions and mandates.

23.     A proper repair of the gearbox requires a complete replacement of the gearbox. Waupaca knew or reasonably should have known this fact.

24.     Waupaca promised owners of its elevators whose gearbox inspections showed deterioration that they would receive a new gearbox. However, Waupaca has inadequate inventories of replacement gearboxes to meet the demands of its own recall efforts.

25.     As an alternative to not having a sufficient inventory of replacement gearboxes available or on order, Waupaca agreed to provide an over-speed braking device designed by Waupaca's employees.[2] In instances, where the shavings were detected, Waupaca would supply owners of its elevators with the device. However, if no shavings were detected, Waupaca would do nothing further.

---

[2] The over-speed braking device is not effective in preventing the elevator cab to crash after it falls, as is evident by the free fall and crash in *Fortenberry v. 1364 LLC, et al.*, Case No. 21 CVS 187 (Brunswick County). The elevator that crashed with Ms. Fortenberry had an over-speed braking device that had been installed approximately 7 months prior to it crashing to the ground due to the failure of the over-speed braking device to engage.

6

26.    The recall and promises made by Waupaca to owners of its elevators during the recall have been merely illusory – repairs have not been provided to consumers.

27.    At all relevant times, Waupaca knew that some of its owners, such as the Plaintiffs, who are in their 70s, have limited mobility and must depend upon their elevators to move about their homes.

28.    Although Waupaca initiated the recall with the CPSC in October of 2018, it had knowledge long before then of the dangers associated with this problem.

29.    Upon information and belief, Waupaca received notice in late 1998 of an injury that occurred due to the fall of a Waupaca elevator in Minot, North Dakota as the result of a gearbox failure in a winding drum elevator.

30.    In 2002, Waupaca received notice when it was a named defendant in a lawsuit filed in the Parish of Orleans, Louisiana, after a Waupaca residential elevator fell, causing injury, as the result of a gearbox failure.

31.    In 2010, Waupaca was again named a defendant in a lawsuit, this one filed in Cass County, North Dakota, after severe physical injury was caused gearbox failure in a Waupaca elevator.

32.    In 2012, Waupaca was a defendant in a lawsuit filed in Brunswick County, North Carolina, after a gearbox failure resulted in the crash of a residential elevator.

33.    And in 2014, a lawsuit filed in Cedar County, Iowa named Waupaca a defendant as after the premature failure of a gear in the gearbox, which caused the elevator in that case to free fall and crash.

34.    Yet, having received numerous complaints and been named in numerous lawsuits for the same problem with its elevators, Defendant Waupaca did not notify its network of

7

authorized dealers and residential elevator service providers that there were any defects to be alert to, or to test for, until January 2018.

35.     On January 30, 2018, Waupaca issued a "Tech Bulletin" to its network of approved dealers and service companies asking their help in communicating concerns surrounding the elevator's powerhead assembly which contains the gearbox. A true and correct copy of the Tech Bulletin is attached hereto as Exhibit "A" and is incorporated by reference herein.

36.     Either concurrent with that bulletin or shortly after issuing it, Waupaca then asked its dealers to distribute a notice to homeowners, which was drafted by Waupaca. Because Waupaca did "not have a means of identifying or directly contacting the owners and addresses associated with [their] elevators," it asked the dealers and service companies to notify the owners on their behalf. See Dealer Safety Notice Letter, a true and correct copy of which is attached hereto as Exhibit "B" and is incorporated by reference herein.

37.     In its Dealer Safety Notice Letter, Waupaca requested its affiliates issue not only the Tech Bulletin in Exhibit "A", but also an "Important Safety Notice" to homeowners, which was also drafted by Waupaca, and which is attached hereto as Exhibit "C." The attachment is incorporated by reference herein.

38.     After receiving the "Important Safety Notice" and "Tech Bulletin" in early to mid-2018 from Waupaca's authorized dealer and service company, Plaintiff Richard Brackin made arrangements with Above All Elevators to take a sample of the oil in the gearbox of his elevator and to forward that sample to Waupaca, as instructed by the Waupaca notices.

39.     After the sample was taken, it was forwarded to Waupaca for testing. After the testing, Waupaca notified Above All Elevators and its representatives that the sample was negative for the presence of metal shavings.

40.     Based upon the representations contained in the materials that they received from Waupaca through its dealer and service company network, Plaintiffs were lulled into believing that their elevator was safe to use and that the gears inside the gearbox were not shorn. Because Waupaca had initiated the recall, because it was most familiar with its own elevators, and because Waupaca had indicated that oil sampling would detect a problem, Plaintiffs' reliance upon these misrepresentations was reasonable and, as any homeowner would under the circumstances, they justifiably relied upon those misrepresentations.

41.     Likewise, nowhere in the language of Waupaca's notices to owners, including both its "Important Safety Notice" and its "Tech Bulletin" was there any statement that would alert owners and users of its elevators of the imminent dangers associated with continuing to use the elevator. Instead, the statements written by Waupaca and sent to its affiliates to be distributed were inaccurate, incomplete and misleading in that regard. For example, Waupaca stated in its "Important Safety Notice":

> To: Owners of Waupaca Elevators
>
> Regarding: Potential failure of a portion of the lifting mechanism resulting in a possible unexpected drop of your elevator.
>
> Waupaca Elevator Company has become aware of a potential safety concern with your elevator.
>
> This potential hazard is associated with normal wear in your elevator. This is not a defect in the product, simply a possible type of failure caused by normal use over time. In response to this potential hazard we recommend you contact your elevator installer or service company. If you need assistance locating a service company or answering questions please call us at (920) 997-0920.

42.     The statements above are misleading and/or false because the gearbox hazard is not normal wear and tear.

43.     The notice confirms the foreseeability that persons riding the elevators would sustain injuries.

> **WARNING** - If your elevator develops this problem and it is not repaired, the elevator may drop unexpectedly with you in it and you may be injured.

44.     The notice further states:

> **Symptoms of Possible Failure**
> The development of this problem will occur gradually. It is not possible to visually inspect your gearbox to determine if or when a failure may occur. Prior to a complete failure there will be symptoms that the failure is beginning. As the gearbox wears out you will notice one or more of the following symptoms:
>
> 1. Tripping of the circuit breaker that serves your elevator
> 2. Ticking sound from the elevator motor when it is running
> 3. Elevator that stops during operation

> # Important Safety Notice
>
> If you experience any of these symptoms we strongly recommend that you discontinue use of the elevator and contact your service company immediately for repair and service.
>
> If you have not experienced any of these symptoms we ask that you keep this letter with your documentation for the elevator for future reference and that you share it with any future owner of your home.
>
> As a helpful reminder of the information in this important safety notice, we have enclosed a sticker that should be placed on the outside cover of the grey electrical box for your elevator.
>
> Please remember that Waupaca Elevator Co. recommends getting annual service of your elevator by a qualified technician from your local authorized Waupaca Elevator dealer.

45.     The statements contained in the notice are untrue, inaccurate, deceptive and dangerous. The recalled elevators are subject to sudden and potentially fatal crashes in the absence of the symptoms listed beforehand. In fact, the elevator in Plaintiffs' home fell and crashed without

displaying any of the enumerated symptoms. Thus, Waupaca wrongfully informed elevator owners that they need only look out for the enumerated "symptoms" and discontinue use if those symptoms appear. Otherwise, Waupaca indicates the owner simply keep the notice and share the same with subsequent purchasers.

46.     The notice(s) sent by Waupaca and other statements to the public made by Waupaca and/or its authorized dealers were false and misleading; the promised recall remedies (which are unavailable), and even the diagnostic inspections by Waupaca-trained technicians, were inadequate. Together, the statements and misstatements, actions and inactions of Waupaca have caused crashes and injuries to occupants, including Plaintiffs Richard and Dolores Brackin, and will continue to cause these tragedies in the future.

## FIRST CLAIM FOR RELIEF
### *Negligence and Gross Negligence*

47.     Plaintiffs reallege and incorporate by reference the foregoing paragraphs as if fully set forth herein.

48.     As a supplier and producer of residential elevators, Defendant Waupaca owes certain duties of care to the owners of its elevators. These duties arise, in part, due to Waupaca's position as a manufacturer/product of a product, but they also arise independently and distinctly under common law. Further, because Waupaca voluntarily undertook a recall, it agreed to notify current owners of its products of the dangers associated with continuing to use the elevators and to provide a reasonable repair or replacement to mitigate the serious risks imposed by the company's elevators.

49.     Once Waupaca assumed a duty to provide that information and warning, as it clearly did in this instance by seeking approval from the CPSC and drafting the various notices that were sent to homeowners by Waupaca's dealers and service companies, the Defendant had

the obligation to fully and completely inform current owners and users of the actual risks associated with continued use of the elevator.

50.     That duty also encompasses the obligation to use reasonable care in its communications about the recall to avoid implying anything that was untrue, or that mislead an owner as to the potentially imminent failure of the gearbox and elevator.

51.     At all relevant times, Waupaca knew or should have known that the gears in its residential elevators could wear down and fail after the elevators were in use, resulting in injuries to passengers in the elevators, such as the Plaintiffs.

52.     In addition, Plaintiffs are informed and believe that in the years immediately preceding the fall in this case, Waupaca had knowledge from other users of its residential elevators that the gearbox presented an unreasonable risk, and that its elevators could fall without any sign of failure beforehand.

53.     Despite this knowledge that its elevators could fail without any sign of failure beforehand, Defendant failed to fully warn owners, including the Plaintiffs, of the seriousness of that risk.

54.     For example, the notice that Waupaca eventually provided to consumers identified the problem as being "associated with normal wear" adding that it "was not a defect in the product." Waupaca then recommended owners contact a local elevator service company for assistance, **which the Plaintiffs did**. After an oil sample was collected and sent to Waupaca for analysis, the Plaintiffs were informed that their elevator had no metal shavings and thus did not need a replacement at this point. Moreover, the notice assured them that "[t]he development of this problem will occur gradually." And, that "[p]rior to a complete failure, there will be

symptoms that the failure is beginning." Finally, the notice stated that "[a]s the gearbox wears out you will notice one or more of the following symptoms…."

55.     Waupaca's notice is deficient.  Nowhere does the notice inform owners that the elevator could still fall without manifesting any of the listed symptoms, as was the case with the Plaintiffs' elevator.  To the contrary, it expressly states that several symptoms will appear before a complete failure.  Even the choice of "complete failure" suggests that the process will be gradual and not sudden, providing a false sense of security to the owner.

56.     Also, the notice does not identify problems associated with oil sampling, namely that the test results are not always indicative of the true condition of the gearbox and that the sample may not detect the presence of metal shavings, even when those shavings are present in the oil.

57.     Had Waupaca provided a complete and accurate warning to the Plaintiffs, had Waupaca informed them about the shortcomings of both the overspeed braking device and oil sampling, the Plaintiffs would not have continued to use the elevator and would have installed another device.  Instead, as a result of Waupaca's inadequate recall notices, they believed that their elevator was safe to use for the time being, did not require replacement of the gearbox and would manifest signs prior to a complete failure.

58.     As a direct and proximate result of the breach of these duties by Defendant as set forth herein, Plaintiffs suffered serious injuries and damages, including, but not limited to, the following:

        a.    Sustained permanent, serious and painful injuries to their persons;

        b.    Experienced, and will continue to experience in the future, great pain and suffering;

c. Incurred, and continues to incur, medical and other expenses for necessary medical treatment, including ongoing orthopedic treatment and physical therapy;

d. Experienced and continues to experience great discomfort and distress in performing their daily activities and providing care and comfort to each other; and

e. Will continued to suffer these injuries and others to be discovered and proven at trial.

59. All the above damages were directly and proximately caused by the negligence of the Defendant such that it is liable to Plaintiffs for damages in an amount greater than $25,000.

60. The misrepresentations, acts, omissions, and improper conduct by Waupaca, especially given its knowledge and conduct during the recall, were accompanied by a reckless, wanton, and conscious disregard and indifference to the rights and safety of others, including Plaintiffs, all of which Waupaca knew or should have known were reasonably likely to result in injury, damage or other harm. Thus, as a result of these aggravating factors, Plaintiffs are entitled to receive an award of punitive damages from Waupaca.

## SECOND CLAIM FOR RELIEF
### *Negligent Misrepresentation*

61. Plaintiffs reallege and incorporate by reference the foregoing paragraphs as if fully set forth herein.

62. Waupaca, in the course of its business, negligently misrepresented material facts concerning the risks that its elevators, posed to owners of their elevators, particularly associated

14

with the continued use of its product following the announcement of its recall and following Waupaca's recommended testing of its product, namely oil sampling.

63.   Waupaca knew or should have known, under the circumstances, that those misrepresentations, described above, were false.

64.   Those misrepresentations by Waupaca were made with the intent to mislead, and did mislead, consumers and regulators as to the real risks associated with to the continued use of Waupaca's elevators.   Further, because participation in the Fast Track Program avoided a preliminary determination of a potentially "defective product," which both Waupaca and the industry recognize would prompt significant and costly litigation throughout the country, Waupaca chose to misrepresent the true condition of the gearbox and the inability of its oil sampling to detect actual shearing of the ring gear's teeth.

65.   As such, Waupaca failed to exercise reasonable care of competence in communicating truthful and accurate information to the Plaintiffs and failed to comply with the existing standard of care.

66.   Plaintiffs Richard and Dolores Brackin relied upon the information provided to them by Waupaca, contacting their local elevator service office to schedule an oil sampling as instructed, and keeping alert to the symptoms identified above as indications their gearbox was failing.

67.   When their oil sampling test came back negative for metal shavings after testing by Waupaca and/or an laboratory chosen by Waupaca, the Plaintiffs believed they had done all that was required to verify the continued safety of their elevator.

68.   As a direct and proximate result of Waupaca's misrepresentations, statements and misstatements, Plaintiffs reasonably believed that their elevator was safe, that their gearbox did

not pose an imminent danger and that their elevator would manifest certain "symptoms" prior to a complete failure. Waupaca owed Plaintiffs and other owners of its elevators accurate information: that the elevator was being recalled because it posed an immediate danger to users, not just because of normal wear and tear; that the oil sampling test does not always detect metal shavings even if they are present and that the oil sampling test at any rate is not predictive of the safety of the elevators.

69. Had Plaintiffs had such accurate information about their Waupaca elevator, they would not have continued to use it.

70. As a direct and proximate result of the breach of the duties owed to Plaintiffs by Defendant as set forth herein, Plaintiffs:

      a.    Sustained permanent, serious and disabling injuries to their persons;

      b.    Experienced, and will continue to experience in the future, great pain and suffering;

      c.    Incurred, and continue to incur, medical and other expenses for necessary medical treatment, including ongoing orthopedic treatment and physical therapy;

      d.    Experienced and continue to experience great discomfort and distress in performing their daily activities and providing care and comfort to each other; and

      e.    Will continue to suffer these injuries and others to be discovered and proven at trial.

71. All the above damages were directly and proximately caused by the negligence of the Defendant such that it is liable to Plaintiffs for damages in an amount greater than $25,000.

16

## THIRD CLAIM FOR RELIEF
### *Fraudulent Concealment*

72.     Plaintiffs reallege and incorporate by reference the foregoing paragraphs as if fully set forth herein.

73.     Waupaca, in the course of its business, failed to disclose and did fraudulently conceal material facts concerning the risks that its elevators posed to owners of the elevators, particularly risks associated with the continued use of its product following the announcement of its recall and following Waupaca's recommended testing of its product by oil sampling.

74.     Waupaca knew or should have known, under the circumstances, that its elevators were being recalled because it posed a danger to the safety of users, not for a problem associated with normal wear and tear, which it failed to disclose and fraudulently concealed from elevator owners including Plaintiffs.

75.     Waupaca knew or should have known, under the circumstances, that its elevators posed a risk of falling, injury or even death, even when its elevators did not exhibit "symptoms" enumerated in its notices to elevator owners, but Waupaca failed to disclose and fraudulently concealed the fact that a symptom-less fall of its elevators continued to pose serious risk to the owners of its elevators.

76.     Waupaca knew or should have known that oil sampling of the gearbox was not a dispositive measure of the safety of its elevators but failed to disclose and fraudulently concealed the predictive shortcomings of the oil sampling test it prescribed and the continued risk the use of its elevators posed to owners.

77.     Waupaca's artfully intentional failures to disclose, and to fraudulently conceal, crucial safety information regarding the risks of its elevators, and the inadequacy of the oil

sampling it prescribed and provided, were intended to mislead, and did mislead, consumers as to the real risks associated with to the continued use of Waupaca's elevators.

78.    As such, Waupaca failed to exercise reasonable care of competence in communicating truthful, accurate, and complete information to the Plaintiffs and thereby failed to comply with their duty of care to Plaintiffs and other owners of its elevators.

79.    As a direct and proximate result of Waupaca's failure to disclose and fraudulently conceal crucial safety information to Plaintiffs regarding the real risks associated with the continued use of its elevators, Plaintiffs believed they had taken the only affirmative steps available – to have the oil sampling test done – and that so long as their elevator exhibited no "symptoms" of failure, they could continue to use the elevator safely.

80.    Having relied on the partial and therefore inaccurate and misleading information provided by Waupaca, Plaintiffs in fact did continue to use their elevator after having the oil sampling test performed – with no metal shavings found.

81.    Having relied on the partial and therefore inaccurate and misleading information provided by Waupaca, Plaintiffs did continue to use their elevator, listening for and alert to any symptoms as set out in notices from Waupaca about imminent or emergent problems with the elevator, not knowing that a lack of such symptoms did not indicate the elevator might still fail. In this case, in fact, it did.

82.    Had Plaintiffs had accurate and complete information about the dangers and persistent safety risks of their Waupaca elevator, they would not have continued to use it.

83.    As a direct and proximate result of the breach of the duties owed to Plaintiffs by Defendant as set forth herein, Plaintiffs:

a. Incurred, and continue to incur, medical and other expenses for necessary medical treatment, including ongoing orthopedic treatment and physical therapy;

b. Experienced and continue to experience great discomfort and distress in performing their daily activities and providing care and comfort to each other; and

c. Will continue to suffer these injuries and others to be discovered and proven at trial.

84. All the above damages were directly and proximately caused by the failure to disclose and fraudulent concealment of the Defendant such that it is liable to Plaintiffs for damages in an amount greater than $25,000.

## FOURTH CLAIM FOR RELIEF
### *Violation of North Carolina's Unfair and Deceptive Trade Practices Act*

85. Plaintiffs reallege and incorporate by reference the foregoing paragraphs as if fully set forth herein.

86. As set out plainly above, Defendant Waupaca engaged in unfair and deceptive acts and practices including but not limited to:

a. negligently misrepresenting to its elevator owners that its elevators were not being recalled because they posed a danger to users but for an issue related to normal wear and tear;

b. negligently misrepresenting to its elevator owners that the problems with its elevators' gearboxes could be fixed with a replacement gearbox – which they have not made available to all owners of its elevators more than two years after their recall notice in October 2018;

19

c. negligently misrepresenting to its elevator owners including Plaintiffs, that in the absence of a replacement gearbox, owners could have their gearbox tested with an oil sampling to determine the safety of their elevators' continued use;

d. failed to disclose or fraudulently concealed that the oil sampling test is not predictive of the safety of their elevators' continued use;

e. negligently misrepresented to its elevator owners, including Plaintiffs, that before its elevators failed, posing risk of injury or death, the elevators would exhibit tell-tale symptoms alerting the owners to the imminent risk of continued use of the elevators; and

f. failed to disclose or fraudulently concealed that the elevator "symptoms" were not dispositive signals of imminent failure of the elevators.

80. Waupaca's unfair or deceptive acts and practices enumerated above occurred in the course of its dealings with regulators, dealers and consumers such as Plaintiffs; therefore said unfair or deceptive acts and practices occurred in and affecting commerce.

81. Because of Waupaca's unfair or deceptive acts and practices described above, Plaintiffs continued to use their Waupaca elevator even when the company knew or should have known that it was unsafe for its consumers to do so. Therefore, Waupaca's unfair or deceptive acts and practices, occurring in and affecting commerce, were the direct and proximate cause of Plaintiffs' serious, painful and disabling injuries.

82. Having violated North Carolina's Unfair and Deceptive Trade Practices Act, Defendant's actions or failures to act were the direct and proximate cause of Plaintiffs' injuries.

83. Because of Defendant's actions or failures to act, in violation of North Carolina's Unfair and Deceptive Trade Practices Act, as set forth herein, Plaintiffs:

20

a. Incurred, and continue to incur, medical and other expenses for necessary medical treatment, including ongoing orthopedic treatment and physical therapy;

b. Experienced and continue to experience great discomfort and distress in performing their daily activities and providing care and comfort to each other; and

c. Will continue to suffer these injuries and others to be discovered and proven at trial.

84. All the above damages were directly and proximately caused Defendant's violations of North Carolina's Unfair and Deceptive Trade Practices Act such that Waupaca is liable to Plaintiffs for damages in an amount greater than $25,000.

## FIFTH CLAIM FOR RELIEF
### *Loss of Consortium*

85. Plaintiffs reallege and incorporate by reference the foregoing paragraphs as if fully set forth herein.

86. On the date of the elevator's free fall and crash, and at all times relevant to this action, Plaintiffs were legally married.

87. Plaintiffs' marital relationship with one another provided marital services, society, affection, companionship, and/or sexual relations.

88. As a direct and proximate result of the actions and/or omissions of Defendant, , Plaintiffs were severely injured.

89. As a direct, proximate and factual result of Plaintiffs' injuries from the crash of the elevator, Plaintiff, and each of them, were deprived of the consortium (marital services, guidance, society, affection, companionship, and/or sexual relations) of each other such that the Defendant is liable to them in an amount to be determined.

WHEREFORE, Plaintiffs pray for relief against the Defendant, as follows:

1. That Plaintiffs receive a judgment against the Defendant in excess of $25,000;

21

2.  That costs and expenses of this action be taxed against the Defendant and attorneys' fees be taxed against the Defendant if allowed by law;

3.  Punitive damages as allowed by law;

4.  For such other relief that the Court finds just and reasonable; and

5.  For trial by jury on all issues so triable.

This the 15th day of April, 2021.

RHINE LAW FIRM, P.C.

Joel R. Rhine
North Carolina State Bar No. 16028
Email: jrr@rhinelawfirm.com
Martin A. Ramey
North Carolina State Bar No. 33617
Email: mjr@rhinelawfirm.com
Janet Coleman
North Carolina State Bar No, 12363
Email: jrc@rhinelawfirm.com
Ruth Sheehan
North Carolina State Bar No. 48069
Email: ras@rhinelawfirm.com
1612 Military Cutoff Road, Suite 300
Wilmington, NC 28403
Tel: (910) 772-9960
Fax: (910) 772-9062

*Attorneys for Plaintiff*